# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

KELLEY-MOSER CONSULTING, LLC,    )
                                    )       C.A. NO.: 3:10-CV-02057-CMC
           Plaintiff,      )
                                      )       OPINION AND ORDER
      v.                        )       ON CROSS MOTIONS
                                      )     FOR SUMMARY JUDGMENT
DR. TIMOTHY DANIELS,         )
                                      )
          Defendant.     )
_____    )

This matter is before the court on cross motions for summary judgment: Defendant, Timothy Daniels, Ed. D., ("Dr. Daniels"), seeks summary judgment on the single claim for defamation asserted by Plaintiff Kelley-Moser Consulting, LLC ("Kelley-Moser"); and Kelley-Moser seeks summary judgment on Dr. Daniels' two counterclaims for defamation and tortious interference with advantage. For reasons set forth below, both motions are granted and judgment shall be entered in Defendant's favor on Plaintiff's claim and in Plaintiff's favor on Defendant's counterclaims.

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (as amended December 1, 2010). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).  When the nonmoving party has the ultimate burden of proof on an issue, the

moving party must identify the parts of the record that demonstrate the nonmoving party lacks

sufficient evidence.  The nonmoving party must then go beyond the pleadings and designate

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the

building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment

motion."  *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

Taken in the light most favorable to the nonmoving party, the facts are set out below.[1]

The claim and counterclaims at issue in this action arise from negative comments each party made

about the other.  During the relevant period (mid 2008 through July 2009), Dr. Daniels served as

Superintendent of the South Carolina Charter School District ("District").  During most of the same

period, Kelley-Moser provided financial services to the District and a number of charter schools

within the District under two Financial Management and Consulting Agreements ("Financial

Services Agreements").[2]  By the end of the relevant period, Kelley-Moser's Financial Services

---

[1]  Because this order addresses cross motions for summary judgment, the facts are presented
in Kelley-Moser's favor with respect to its claim and in Dr. Daniels' favor with respect to his
counterclaims.

[2]  Dr. Daniels' predecessor, Dr. Barbara Nielsen ("Dr. Nielsen"), entered two Financial
Services Agreements with Kelley-Moser in June 2008, one to provide services to the District and
one to provide services to charter schools within the District.  Dkt. No. 42-6, 42-7.  Both contracts
ran for a one year term from July 1, 2008, to June 30, 2009.

Agreements had expired and not been renewed. Dr. Daniels' contract with the District had, likewise, expired and not been renewed.

## I. FACTS RELEVANT TO DR. DANIELS' MOTION FOR SUMMARY JUDGMENT ON KELLEY-MOSER'S DEFAMATION CLAIM.

**Alleged Defamatory Statements.** Kelley-Moser alleges that Dr. Daniels made a number of defamatory statements which reflected negatively on Kelley-Moser's fitness to perform in its professional capacity, thus constituting defamation *per se*. The subject matter of most of the alleged statements falls into the following three categories: (1) statements that Kelley-Moser had a monopoly on providing financial services to the charter schools ("Monopoly Comments"); statements that Kelley-Moser's concurrent contracts with the District and charter schools within the District constituted a conflict of interest ("Conflict Comments"); and statements that Kelley-Moser "wrote its own checks" ("Check-Writing Comments"). Complaint ¶¶ 7-9. Additional comments made on a more limited basis are discussed below.

**Comments to Persons Affiliated with District or Related Association.** For purposes of this order, the court accepts as true that Dr. Daniels made Monopoly Comments, Conflict Comments and Check-Writing Comments to members of his own staff ("District Employees") and to members of the District's Board of Trustees ("District Board Members"). *See generally* Dkt. No. 42-26 (Second Deposition of Dr. Daniels at 99-104, 113-15, 119-22 ("Second Daniels dep.")) (conceding making Conflict Comments to various District Employees and District Board Members, stating that it was possible he made Monopoly Comments to these individuals and others, and explaining that, if he referred to a "monopoly," that was a misnomer as his real concern was the conflict of

interest)).[3] Evidence supports an inference that these comments began no later than the fall of 2008. For purposes of this order, the court also accepts as true that Dr. Daniels made Conflict Comments and Monopoly Comments to one or more senior representatives of the South Carolina Charter School Association ("Association").[4] Second Daniels dep. at 103 (conceding it was possible he made Conflict Comments to Mary Carmichael during a "candid conversation about the whole situation").

There is also evidence, albeit somewhat vague and not first-hand, that Dr. Daniels made negative comments about Kelley-Moser to representatives of at least two charter schools within the District. The proffered evidence relating to these conversations consists of deposition testimony by William Moser ("Bill Moser" or "Moser"), one of Kelley-Moser's principals, that at least two individuals associated with charter schools advised him they had participated in conversations with Dr. Daniels, which the school representatives described as dedicated to "bashing" Kelley-Moser.

---

[3] Three witnesses whose testimony is offered in this action, Dr. Daniels and District Board Members Donald McLaurin ("McLaurin") and Terrye Seckinger ("Seckinger"), also provided deposition testimony in an earlier action brought by a District Employee. Depositions from the earlier action are designated the "first deposition" for each of these witnesses. Depositions in this action are designated as the witnesses' second (and, for Dr. Daniels, also his third) deposition.

[4] The Association was independent of the District but served as a resource for the District and its charter schools. When Dr. Daniels began work with the District, Dr. David Church ("Dr. Church") was serving in a senior capacity with the Association while also serving as a District Board Member. *See generally* Dkt. No. 42-22 (Second Deposition of Donald L. McLaurin at 124-25, 130-31) ("Second McLaurin dep."). When asked whether he believed Kelley-Moser had a conflict of interest or was a monopoly and, if so, why, McLaurin referred to the close relationship between Dr. Church and Kelley-Moser and the fact that Dr. Church routinely and exclusively recommended Kelley-Moser as financial services provider to charter schools. *Id.* at 123, 135, 137. In his deposition, Dr. Daniels referred to a similar concern, although he indicated his concern was normally expressed as concern over a conflict of interest. Dkt. No. 42-26 (Second Daniels dep. at 113-14, 121-22).

*See* Dkt. No. 44 at 4 (Deposition of Bill Moser at 50-51 ("Moser dep.")).[5]  The specific content of the alleged comments is not, however, provided.  Neither has Kelley-Moser pointed to any first-hand evidence of the comments.  For purposes of this order, the court will, nonetheless, assume that these conversations occurred and included Conflict Comments or Monopoly Comments or both.

    **Comments to Hobbs Group.**  At some point during the year, Dr. Daniels asked a competitor of Kelley-Moser, The Hobbs Group, P.A. ("Hobbs Group"), whether it thought Kelley-Moser's concurrent service to the District and subordinate schools constituted a conflict of interest.[6]  By late April 2009, Dr. Daniels had decided not to renew Kelley-Moser's contract and, instead, contracted with the Hobbs Group for the coming year.[7]

---

[5] One of these alleged conversations is reported by Kelley-Moser in its April 15, 2009 letter and formal complaint to the Governor and others.  *See infra* Facts § 2 ("Dr. Daniels' Counterclaims").

[6] No later than February 2009, Dr. Daniels asked the District's auditor if it believed Kelley-Moser had a conflict of interest.  The auditor opined that there was no conflict so long as Kelley-Moser was only providing bookkeeping services, rather than making decisions as to allocation of funds.  Dkt. No. 41-4 (auditor's letter dated 2/17/2009); Dkt. No. 42-26 (Second Daniels dep. at 104).  Dr. Daniels later asked the Hobbs Group the same question.  The Hobbs Group stated that the situation was "not typical," an "unusual state of affairs," and "not a good business relationship." *Id.* (Second Daniels dep. at 107-10).  For purposes of this order, the court assumes that Dr. Daniels made at least some of his Conflict Comments after receiving these opinions and continued to make such comments to some members of his staff even after receiving a cease and desist letter from Kelley-Moser's attorney.  *See* Dkt. No. 41-9 (April 24, 2009 letter from Kelley-Moser's attorney).

[7] Dr. Daniels' decision not to renew Kelley-Moser's contract (or at least the manifestation of that decision) followed a letter and formal complaint Kelley-Moser sent to the Governor and other government officials on April 15, 2008.  Dkt. No. 42-15.  This letter and formal complaint form part of the basis of Daniels' counterclaims.  *See* Facts § II.  Kelley-Moser forwarded a copy of these documents to Daniels via email dated April 16, 2008.  Dkt. No. 42-16.  That email, written by Bill Moser, included various comments evidencing animosity and arguably implying some form of a threat.  *Id.* (referring to Dr. Daniels' conduct as "despicable," calling Dr. Daniels "the single most unprincipled individual that I have had the displeasure to work with," stating that Dr. Daniels' "attacks . . . are repugnant and by god, it stops here and now," and warning "[y]ou want to continue, then tighten your chin strap cowboy, because I will protect my family") (emphasis in original).

On April 29, 2009, Dr. Daniels sent an email to the Hobbs Group which listed a number of matters which needed to be addressed in the transition process. Dkt. No. 42-12 ("Transition Comments"). This email (1) expressed concern that there might be "time bombs" in the data provided by Kelley-Moser, (2) encouraged the Hobbs Group to take a representative of the District with them to retrieve the District's proprietary information from Kelley-Moser so nothing would be missed, and (3) suggested Kelley-Moser's final check not be issued until after all data was transferred and all proprietary materials returned. *Id.*

**Nonrenewal of Dr. Daniels' Contract.** On June 6, 2009, Kelley-Moser mailed or delivered a grievance to the District Board which repeated its April 15, 2009 formal complaint to the Governor and others. Dkt. No. 42-18; see also *supra* n. 7. In addition, it stated that Dr. Daniels met with the Hobbs Group on April 24, 2009, as evidenced by an April 27, 2009 letter from the Hobbs Group to Dr. Daniels, and that Kelley-Moser was informed on April 29, 2009 that its contract with the District would not be renewed. *Id.* at 3 (complaining that the nonrenewal of Kelley-Moser's contract was "part and parcel of [Dr. Daniels'] deliberate actions to damage [Kelley-Moser]" and "were in retaliation for our formal complaint [to the Governor]").[8]

On June 11, 2009, the District Board voted six to five not to authorize negotiations for renewal of Dr. Daniels' contract. Dkt. No. 42-19 at 3. Dr. Daniels was promptly informed that his contract would not be renewed. He did, however, retain his position until July 31, 2009.

**Comments to Joel Medley of the South Carolina Department of Education.** On July 17, 2009, Dr. Daniels sent an email to Joel Medley, the acting head of charter schools with the South

---

[8] Kelley-Moser has asserted only a claim for defamation. It has not asserted any claim directly challenging Dr. Daniels' decision not to renew Kelley-Moser's Financial Services Agreements.

Carolina Department of Education. Dkt. No. 41-11. This email addressed one specific charter school, referred to as the state's "16th obsolete charter school." It then stated that many of the obsolete schools fell "in the category of poor rural and minority charter schools, founded with initiative from the association with Kelley[-]Moser in the back office." *Id.* (also nothing that "[f]rom a federal perspective, this is a total waste of more than $400,000 in start up money").[9]

**Comments to Non-Affiliated Entities and Individuals.** At least some of Dr. Daniels' allegedly defamatory statements were made to individuals or entities less closely linked to the District. These comments included an email written to Todd Ziebarth, the Vice President for Policy for the National Alliance for Public Charter Schools ("National Alliance") on July 22, 2009, and comments made to representatives of Charter School Choice ("Charter Choice") in early 2009, an entity based in Pennsylvania which provided services similar to those provided by Kelley-Moser.

The email to Ziebarth was written shortly after the email to Medley and addressed the same subject matter, albeit in somewhat different terms. Dkt. No. 42-13. The email included the following content:

> This [obsolete charter] school, like more than half on the list [of obsolete charter schools], was literally started by David Church and the [Association]. His team included the "back office" finance manager, who did all the financial work for the school. In these failed schools, this individual and the Association are always paid their full fees before the school goes bankrupt. Unfortunately, the new Director [of the Association] is doing the same thing. . . . This situation is serious enough, a state association actually profiting from failed charter schools[,] that it's worth talking about.

Dkt. No. 42-13.

_____

[9] Although no comment to this effect is directly stated in the letter, Kelley-Moser argues that these statements are defamatory because they imply "that [Kelley-Moser] was complicit in setting up schools that would fail in order for [Kelley-Moser] to make money." Dkt. No. 44 at 6.

The email to Ziebarth did not mention Kelley-Moser by name. Neither has any evidence been proffered which would raise an inference that Ziebarth, who worked for the National Alliance which was based in Pennsylvania, understood Dr. Daniels' comments about a "back office" finance manager to refer to Kelley-Moser.

Dr. Daniels' alleged comments to Charter Choice were made at some point between February and April 2009 when Charter Choice representatives were visiting South Carolina and were invited to dinner at Dr. Daniels' home. Dkt. No. 42-23 (Bill Moser dep at 43-46). At the time, Kelley-Moser was in merger discussions with Charter Choice. The only evidence proffered of the alleged defamatory comments is Bill Moser's testimony that, after the dinner, Charter Choice representatives told him that Dr. Daniels discouraged the merger by telling Charter Choice's representatives "you don't need to go with [Kelley-Moser]" to provide services to South Carolina charter schools and that it was "good to have competition" in the market. *Id.*[10]

## II. FACTS RELEVANT TO KELLEY-MOSER'S MOTION FOR SUMMARY JUDGMENT ON DR. DANIELS' CLAIMS FOR DEFAMATION AND TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

**Dr. Daniels' Counterclaims.** Dr. Daniels' counterclaims relate to negative comments Kelley-Moser made about Dr. Daniels to a number of individuals, some directly involved with the District and others having a more remote connection. For example, Dr. Daniels points to a letter and formal complaint Kelley-Moser sent on April 15, 2009, to the Governor, Speaker of the House, and President *Pro Temporare* of the Senate, which was copied to the Attorney General and others. Dkt. No. 42-15 at 1-5 (letter and formal complaint); *id.* at 6-7 (cover letters forwarding the "base letter"

---

[10] Kelley-Moser has not asserted a claim for tortious interference with prospective advantage. Thus, these comments are relevant only to a claim for defamation.

to Senator Ronnie Cromer and Representative Nikki Haley, both stating that Kelley-Moser was "the victim of misconduct by a state official"). The cover letter stated that it was being sent to the named addressees because Dr. Daniels and the chair of the District Board[11] were in "lock step in their conduct" and Kelley-Moser did not believe his complaint would "see the light of day if presented to the District Board." Dkt. No. 42-15 at 1 (also noting the addressees "collectively appoint the members of the Board").

The enclosed formal complaint first addressed the factual basis for Kelley-Moser's concerns. Dkt. No. 42-15 at 3-7. These included, primarily, Kelley-Moser's understanding that Dr. Daniels was making Conflict Comments, Monopoly Comments, and Check-Writing Comments to various individuals associated with the District and its charter schools. Kelley-Moser stated that Dr. Daniels began making these statements in the fall of 2008.

The formal complaint characterized one recent incident as the most egregious. Kelley-Moser asserted that this incident established that Dr. Daniels had "clearly cross[ed] the line," and had committed "deliberate and willful misconduct." These characterizations were followed by a description of the underlying incident which Kelley-Moser stated arose after it met with a charter school applicant in Charleston on April 1, 2009, and raised concerns regarding per-pupil funding figures the applicant said were provided by Dr. Daniels. According to Kelley-Moser, the applicant subsequently reported to Bill Moser that, when contacted about the possible error, "Dr. Daniels began using the phrase 'conflict of interest'" and "describ[ed] Kelley-Moser as a 'monopoly.' Further, Dr. Daniels recommended that the charter applicant seek another financial services provider." *Id.*

_____

[11] At the time this letter was written, Seckinger served as the chair of the District Board. She was replaced as chair by McLaurin in the June 11, 2009 meeting.

Kelley-Moser summed up this section by inquiring: "*Can you see how this has developed . . . more and more serious as the events progress?  How Dr. Daniels actions have moved from a simple statement of "conflict of interest" to deliberate aggression towards our business?"*  Dkt. No. 42-15 at 5 (emphasis in original).  In the following paragraph, Kelley-Moser characterized Daniels' actions as "engag[ing] in gross misconduct as a state official" and "abus[ing] his authority and breach[ing] the public trust."  Dkt. No. 42-15 at 5.

The timing and content of Kelley-Moser's letter suggests it was sent in response to Daniels' comments about Kelley-Moser, most particularly the early April comments to the charter school applicant (as reported to Kelley-Moser).  Kelley-Moser forwarded this letter via email to Dr. Daniels on April 16, 2009, including various, arguably threatening comments.  *Supra* n.7 (quoting email).  In his deposition, Bill Moser, the author of the letter, formal complaint and email, conceded that he made his comments in an effort to "hammer" Daniels.  Moser dep. at 100.

On May 20, 2009, Kelley-Moser sent an email to two District Board Members (Dr. Church and Thomas Hatfield) and the former District Superintendent (Barbara Nielsen).  Dkt. No. 42-17 at 1-2.  This email referred to an earlier phone conversation that same day in which one or more of the recipients of the email advised Bill Moser that they were "gathering items . . . to address the issues [Dr. Daniels] has instigated."  *Id.* at 2.  The email proceeded to criticize Dr. Daniels' actions, including with respect to District personnel decisions.  *Id.*  For example, Kelley-Moser stated that Dr. Daniels has slandered the Association and Kelley-Moser, has engaged in similar "misconduct . . . too numerous to list," and was now "going after" a named District Employee.  *Id.*  Kelley-Moser then urged the addressees to "marshal all of your influence [and do] <u>anything and everything . . .</u>

<u>IMMEDIATELY</u> . . . in order to protect" the named District Employee. *Id.* (emphasis and ellipses in original). The email closes as follows:

> I have done what I felt was most appropriate . . . file my complaint with the agents who appoint the District Board – Governor, Speaker, and Senate President. I have engaged my local senator & representative. I have notified the state Attorney General. I am actively engaged with my attorney preparing legal action. Yesterday afternoon I contacted the US Department of Justice for the filing of a Civil Rights Violation complaint. Short of getting a ball bat and having a one-on-one moment of prayer with Dr. Daniels, I am running out of ideas. Hell, I have involved everyone but Santa Claus!
>
> I am asking that you truly SEE what is about to happen & act to prevent it.

Dkt. No. 42-17 at 2.[12]

On the morning of May 22, 2009, District Board Member Hatfield forwarded Kelley-Moser's email to Joe McMullen (another District Board Member) and copied his forwarding comments to the other original recipients and Bill Moser. Dkt. No. 42-17 at 1. This email states:

> It is my intention to include this analysis in the folder that will go to [representatives at] the Governor's office. The plan is then for them to bring Don McLaurin (A Governor's appointee) in and explain the reason for and the contents of the folder. (Which will also include the interviews [of District Employees by Governor's office representatives].)
>
> Right now there appears [sic] to be about 16 to 18 issues of our own. . . .

Dkt. No. 42-17 at 1 (also concluding by stating to Moser, "I know that we can count on your descretion [sic] in not revealing any of this to anyone other than David, Joe, Barbara and me.").

Later that same day, Hatfield sent a second email to Bill Moser advising him of a meeting Hatfield, Seckinger and Nielsen had in February 2009 with the Governor's Chief of Staff. Dkt. No.

---

[12] The email refers to attachments but those are not included in the record. Dkt. No. 42-17 at 1-2. It also indicates Kelley-Moser expected to be paid for its "services" in compiling the enclosed materials. *Id.* at 2.

42-17 at 3. Hatfield states that he and Nielsen "laid out a number of transgressions by [Dr. Daniels]" and that Seckinger "simply said 'I need proof.'" Hatfield stated that this comment led to interviews with staff members (apparently by members of the Governor's staff). Hatfield states that he does not know what was said in the interviews other than "at least three [employees] told it like it was." He then states:

> Our report that will be mailed tomorrow will include, at least, 16 instances where [Dr. Daniels] has stepped over the line. That added to what the interviews produced hopefully will be sufficient to convince the Board to not renew his contract. We also have a plan to insure [sic] that the rest of the Board sees this, not from David, Joe and Tom, but via the Governor's office through a moderate Board Member.
>
> Thanks again for your input and dedication.

Dkt. No. 42-17 at 3.[13]

Roughly two weeks later, on June 6, 2009, Kelley-Moser sent the District Board a modified version of his earlier formal complaint to the Governor. Dkt. No. 42-18 (adding complaints relating to the non-renewal of the Kelley-Moser's Financial Services Agreement with the District). Kelley-Moser took this action at the urging of one of the District Board Members involved in the May 20-22 email exchange so "the Board would have it to act on." Moser dep. at 148-49 (noting the action desired "very well [could have] been" removal of Dr. Daniels as superintendent).

The District Board met on June 11, 2009. Dkt. No. 42-19 (minutes). During that meeting, the District Board voted six to five not to negotiate with Daniels for renewal of his contract. *Id.* at 3. Seckinger was among those who voted in favor of negotiations for renewal. Hatfield, McMullen, Dr. Church and McLaurin were among those who voted against renewal negotiations.

---

[13] The reference to "David, Joe and Tom" presumably refers to the three District Board Members involved in the email exchange: Dr. David Church, Joe McMullen, and Tom Hatfield.

Dr. Daniels testified that he was told the decision not to renew his contract was based on his evaluation which found Dr. Daniels had a "lack of vision and no ability to imagine the future for the District." Dkt. No. 41-17 (First Daniels dep. at 104). Only two District Board Members were deposed, Seckinger (who voted for renewal negotiations) and McLaurin (who voted against). Neither suggested that the nonrenewal was influenced by Kelley-Moser's complaint to the Board. Instead, as explained below, both testified to other motivating concerns.

Seckinger testified that Dr. Daniels was not renewed "[b]ecause he had a hard time running his district. He had a hard time managing his district." Dkt. No. 41-18 (Seckinger dep at. 53). Seckinger explained that, "Dr. Daniels was somewhat distracted with the errancy of some of our board members" and that these difficulties "distracted him from an adequate running of the [District]." Seckinger dep. at 54. Seckinger described Dr. Daniels' job performance as "a fair job" which she characterized as below "good." Seckinger dep. at 53.

McLaurin testified that Dr. Daniels was given a performance review by a three person committee which included McLaurin. Dkt. No. 41-19 (Second McLaurin dep. at 89-90) (noting committee was made up of the "neutral" District Board members – Mike Brenan, Wayne Brazell, and McLaurin).[14] That committee did not consider the letters written about Dr. Daniels. Second McLaurin dep. at 94. Indeed, the evaluation committee's meeting occurred before Kelley-Moser sent its complaint letter to the Board. *Id.* at 98. Although he conceded that a faction within the District Board may have conspired against Dr. Daniels, McLaurin testified that the "neutral members

---

[14] All three members of the evaluation committee voted against renewal negotiations. *See* Dkt. No. 42-19 at 3 (minutes).

[of the committee had] no personal animosity towards Dr. Daniels" and they "did not feel like his performance, purely on a performance basis, was up to standing." McLaurin dep. at 97-98.[15]

It is undisputed that Dr. Daniels was serving under a one-year contract. He maintains that he had a reasonable expectation of renewal based on statements made by Dr. Church, the Board Member who recruited him, and the fact that the District paid roughly $18,000 to move him from Pennsylvania to South Carolina. Dkt. No. 42-26 (Second Daniels dep. at 17, 20, 21). Dr. Church's statements, as recalled by Dr. Daniels, suggest an intent and desire for a longer term relationship but do not support the existence of any promise, even by a single District Board Member, that the contract would be renewed after the first year. *Id.* at 17 (stating first that, when he was recruited, Dr. Church "implied that it would be much longer" than a year, conceding that there was no "promise," answering affirmatively when asked whether Dr. Church "said it would be longer than one year," but acknowledging that his initial contract was only for a one-year period).

## DISCUSSION

### I.      DR. DANIELS' MOTION FOR SUMMARY JUDGMENT ON KELLEY-MOSER'S DEFAMATION CLAIM

Dr. Daniels argues that he is entitled to summary judgment on Kelley-Moser's claim for defamation on the following grounds: (1) he is entitled to "full immunity" under either or both the South Carolina Public Charter School Act ("Charter School Act") which extends immunities available to "employees of traditional public schools" to "[e]mployees of charter schools" or S.C. Code § 15-78-70(a) ("Tort Claims Act") (Dkt. No. 42-1 at 18-20); (2) Kelley-Moser was a limited-

_____

[15] The court has not been directed to any evidence which would draw McLaurin's neutrality into doubt. In addition, McLaurin's negative comments regarding the relationship between Dr. Church, the Association, and Kelley-Moser add credence to his claim that he was neutral (or at least not aligned with the Dr. Church-McMullen-Hatfield faction).

purpose public figure involved in a public controversy which requires it to prove by clear and convincing evidence that Dr. Daniels acted with constitutional actual malice (*id.* at 20-23); (3) Dr. Daniels did not publish any statements with actual malice because he did not entertain serious doubts as to the truth of any of his statements (*id.* at 23-25); (4) Dr. Daniels' statements were subject to a conditional or qualified privilege because the statements were made in good faith to persons with a common interest due to their employment or roles within the charter school community (*id.* at 25-27); (5) Dr. Daniels' allegedly defamatory statements were mere opinions (*id.* at 27-28); and (6) Kelley-Moser's claims are barred by the doctrine of illegality because Kelley-Moser, through its owner and agent, "engaged in a lengthy and ugly smear campaign against Dr. Daniels [which the owner admitted was] intended to 'hammer' Dr. Daniels and ultimately did so by publicly seeking and successfully attaining Dr. Daniels' removal as Superintendent" (*id.* at 28).[16] These arguments are addressed, in a somewhat modified order, below.

### A. Public Figure Status

The court first addresses whether Kelley-Moser is a "limited-purpose public figure" because that determination impacts the elements of proof necessary to prove defamation, the standard of proof as to one element, and the statutory immunity analysis. *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 279-80, 285-86 (1964) (requiring proof of *constitutional* actual malice in actions for defamation brought by public figures, meaning the speaker either knew the statement was false or acted with reckless disregard for its truthfulness, and applying a "convincing clarity" standard of proof); *Sanders v. Prince*, 403 S.E.2d 640 (S.C. 1991) (applying constitutional actual malice

---

[16] This argument corresponds to a section in Dr. Daniels' statement of facts which is labeled "Plaintiff's Unclean Hands." Dkt. No. 42-1 at 13-17.

standard in addressing immunity under the Tort Claims Act in defamation action brought by public figures).[17]

As Dr. Daniels correctly notes in his memorandum in support of summary judgment:

Whether a person is a public figure is a question of law, and the defendant bears the burden of proving the plaintiff's public figure status. *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001). The Fourth Circuit Court of Appeals uses a two-part test to determine whether a plaintiff is a limited-purpose public figure, holding that: "First, we ascertain whether a public controversy gave rise to the defamatory statement. Second, we determine whether the plaintiff's participation in that controversy sufficed to establish him as a public figure within the context of that public controversy." *Carr*, 259 F.3d at 278 (internal quotations omitted); *see also Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 688 (4th Cir. 1989) (noting that, "[A] plaintiff should not be considered a limited-purpose public figure absent the existence of a pre-defamation public controversy in which the plaintiff has become directly involved.").

Dkt. No. 42-1 at 21.

Dr. Daniels argues that Kelley-Moser's claim "involve[s] a public controversy because it focuse[s] on a public school district's management, choice of and treatment of government contractors, and use of taxpayer funds." *Id.* at 21. This argument goes too far as it conflates what constitutes a *matter of public interest* with what constitutes a *public controversy*. The difference between the two concepts is critical as reflected in the five factor test on which Dr. Daniels' relies in arguing that Kelley-Moser is a limited-purpose public figure:

To determine whether a plaintiff thrust itself into a controversy to trigger the limited-purpose public figure status, courts examine whether:

(1) the plaintiff has access to channels of effective communication;
(2) the plaintiff voluntarily assumed a role of special prominence in a public controversy;

---

[17] As explained below, the constitutional actual malice standard differs from the common law actual malice standard both with respect to what must be proved and the standard of proof.

(3) the plaintiff sought to influence the resolution or outcome of the controversy;

(4) the controversy existed prior to the publication of the defamatory statement; and

(5) the plaintiff retained public figure status at the time of the alleged defamation.

*Fitzgerald v. Penthouse Intern., Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982).

Dkt. No. 42-1 at 22 (internal footnote omitted). *See also Erickson v. Jones Street Publishers, LLC.*, 629 S.E.2d 653, 668-69 (S.C. 2006) (adopting constitutional actual malice standard applied in *New York Times v. Sullivan,* 376 U.S. 254 (1964) and Fourth Circuit's five-factor test for determining when a plaintiff is a limited-purpose public figure).

Four of the five *Fitzgerald* factors refer to the existence of a public *controversy.* While a dispute regarding a matter of public interest may certainly become a public controversy, the mere fact that a comment relates to a matter of public interest does not mean that the comment relates to a public controversy. For purposes of Kelley-Moser's claim, the critical considerations are (1) whether there was a public controversy in existence at the time Dr. Daniels made his allegedly defamatory statements, and (2) whether Kelley-Moser had voluntarily assumed a role of special prominence in that controversy at the time of the allegedly defamatory statements.

The "controversy" at issue in this action has two distinct phases (alternatively, there are two distinct controversies). The first phase began in the fall of 2008 when Dr. Daniels began making negative comments about Kelley-Moser. For purposes of Dr. Daniels' motion, the court assumes the comments included Conflict Comments, Monopoly Comments and Check-Writing Comments. This phase continued through early April 2009 when Dr. Daniels made comments along these lines to a charter school applicant and, according to hearsay testimony, recommended it obtain its financial services from a provider other than Kelley-Moser. The second phase began on April 15,

2009, when Kelley-Moser responded to Dr. Daniels' comments and actions by writing to the Governor and other state officials. It was only at this point that Kelley-Moser even arguably became a voluntary participant in a public controversy (prior to that point, it was only the target or subject of a controversy fanned by Dr. Daniels' comments). Thus, Kelley-Moser should not be treated as a limited purpose public figure as to any allegedly defamatory comment predating April 15, 2009 .

Only a few of Dr. Daniels' challenged statements post-dated Kelley-Moser's April 15, 2009 formal complaint to the Governor, at which point Kelley-Moser joined the "controversy" in a somewhat defensive posture. The challenged statements which followed this joinder are limited to (1) the Transition Comments to Hobbs Group in late April 2009, (2) the email to Medley in the State Department of Education in July 2009, and (3) the email to Ziebarth in July 2009.[18] These statements are largely a continuation of the course of comments which commenced in the fall of 2008, rather than a response to any comments Kelley-Moser made when it arguably joined the controversy by complaining to the Governor (and, in May and June, to the District Board). Thus, they do not persuade the court that Kelley-Moser became a limited- purpose public figure even after sending a letter and formal complaint to the Governor and others.

### B.    Statutory Immunity, Common Law Privilege, and Actual Malice

**Statutory Immunity – Charter School Act.**    Dr. Daniels argues he is entitled to full immunity under the "immunity" provision of the Charter School Act, S.C. Code § 59-40-50(B)(4). This section reads, in relevant part, as follows: "Employees of charter schools must be relieved of

---

[18]  The statements to Medley and Ziebarth occurred after Kelley-Moser had expanded its defensive (and to some degree offensive) response to Dr. Daniels' actions (which by then included declining to renew Kelley-Moser's Financial Services Agreement with the District).

personal liability for any tort or contract related to their school *to the same extent that employees of traditional public schools in their school district* or, in the case of the South Carolina Public Charter School District, the local school district in which the charter school is located are relieved[.]" S.C. Code Ann. § 59-40-50(B)(4) (emphasis added). The term "charter school" is defined to include public, *nonprofit corporations* which form "a school that operates within a public school district or the South Carolina Public Charter School District." S.C. Code Ann. § 59-40-40(1) (emphasis added).

Thus, the Charter Schools Act *extends* the same immunities which are available to employees of traditional public schools to employees of public charter schools. This extension of immunities is, presumably, necessary to provide *any* governmental immunity because the employees of charter schools are employees of "nonprofit corporations," not government employees.

As no other underlying source of immunity is cited, the court assumes for purposes of this order that the Tort Claims Act provides the immunities which are extended through Section 59-40-50(B)(4). Thus, the effect of Section 59-40-50(B)(4) is to extend the protections of the Tort Claims Act to employees of schools which fit the statutory definition of "charter school."[19]

Kelley-Moser and Dr. Daniels disagree whether Section 59-40-50(B)(4) applies to employees of the District itself. Unless the immunity extended by Section 59-40-50(B)(4) is founded on something other than the Tort Claims Act (and no other source is cited), this is a disagreement without a difference as the District was created "as a public body." *See* S.C. Code § 59-40-220(A).

---

[19] Particularly in his reply memorandum, Dr. Daniels appears to rely on the Charter School Act as establishing an independent basis for absolute immunity. *See* Dkt. No. 46 at 2-3 (arguing that he is entitled to "full immunity from this lawsuit under the Charter Statute, as a matter of law" and relying on the Tort Claims Act as an alternative basis for immunity). The statutory language does not support Dr. Daniels' position as it merely *extends* and does not *establish* immunity.

It follows that employees of the District, including Dr. Daniels, are public employees protected under the Tort Claims Act regardless of the reach of Section 59-4-50(B).

**Statutory Immunity – Tort Claims Act.** Under the Tort Claims Act, Dr. Daniels has immunity for any statements made "while acting within the scope of his official duty" unless "it is proved that [his] conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime of moral turpitude." S.C. Code Ann. § 15-78-70(a), (b). The Tort Claims Act defines "scope of official duty" to mean "(1) acting in and about the official business of a governmental entity and (2) performing official duties." S.C. Code § 15-78-30(i).

The structure of the immunity language in the Tort Claims Act suggests that an employee first makes a *threshold* showing that an action was within the scope of his official duties, invoking the protection of the Act. This showing shifts the burden to the opposing party to at least present some evidence that the complained of action falls outside the scope of the Act including because it was beyond the scope of the employee's official duties or was done with actual malice.[20] Thus, the scope of an employee's official duties is considered both as a threshold matter and as an exception to immunity.

_____

[20] The Tort Claims Act grants immunity to employees of the State and its political subdivisions "while acting within the scope of official duty" except as expressly waived. S.C. Code § 15-78-20(b); *see also* S.C. Code § 15-78-70(a) (stating that "employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided in subsection (b)"); S.C. Code § 15-78-70(b) (stating that employees are not entitled to immunity "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude."). A corresponding waiver of sovereign immunity allows suits against the State and its political subdivision except for "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude[.]" S.C. Code § 15-78-60.

While the statute may be read to shift not only the burden of production but also the burden of proof to the party opposing immunity (after a threshold showing is made that the act was within the scope of official duties), the court will assume for purposes of this order that only the burden of production shifts. *See generally Frazier v. Badger,* 603 S.E.2d 587, 590 (S.C. 2004) (noting proponent bears the burden of establishing the scope of his official duties). The court also assumes without deciding that actions which are merely within an employee's scope of employment are not necessarily within the scope of his official duties, as the latter is a narrower concept. *Id.* (noting that "'scope of employment' is a broader concept than 'scope of official duties'").[21]

**Comments within the Scope of Official Duties.** As District Superintendent, Dr. Daniels was responsible for the District's finances and, at the least, recommending renewal or non-renewal

_____

[21] In his reply memorandum, Dr. Daniels argues that he is immune from personal liability because all of his comments were made within the scope of his employment. *See* Dkt. No. 46 at 5-8. This argument misconstrues cases addressing when an employer may be held liable for actions of its employees as immunizing the employee from liability. It also mischaracterizes the holding in *South Carolina Budget and Control Board v. Prince*, 403 S.E.2d 643 (1990), which Dr. Daniels describes as having "ruled that the school board chair acted within the scope of his duties and was not personally or individually liable for defamation." Dkt. No. 46 at 7. In fact, the defendant in *Prince* had already been held personally liable for defamation based, in part, on a finding of constitutional actual malice which caused him to lose immunity under the Tort Claims Act. *Id., see also Sanders v. Prince*, 403 S.E.2d 640, 642-43 (S.C. 1991) (holding, in appeal of underlying defamation action, that defendant board member could be sued in his individual capacity (but not his official capacity) because "the [Tort Claims] Act is not the exclusive remedy for a tort committed by a government employee who acts with actual malice[.]"). What was at issue in the later *Prince* decision (the decision cited by Dr. Daniels) was whether the judgment was covered under an insurance policy which covered actions within the scope of employment). The court held that coverage existed in part because the policy language (which covered acts within the scope of employment) was broader than the immunity language in the Tort Claims Act (which applied to acts within the scope of official duties absent proof they were committed with actual malice).

of Kelley-Moser's Financial Services Agreements.[22]  Whether or not he had authority to make the renewal decision on his own, it was appropriate for Dr. Daniels to discuss with the District Board any concerns he had with Kelley-Moser's work for the District or its subordinate schools, renewal (or non-renewal) of its Financial Services Agreements, or the transition to Hobbs Group.  It was also appropriate for Dr. Daniels to discuss issues and concerns relating to Kelley-Moser with members of his own staff, particularly given the relatively small size of his staff (six or seven individuals).[23] Dr. Daniels' comments to representatives of charter schools within the District (or charter school applicants) regarding the same matters also satisfy the threshold showing that they were within the scope of Dr. Daniels' official duties given the District's responsibility for oversight of the subordinate charter schools.[24]  Thus, Dr. Daniels satisfies the *threshold* for immunity under the Tort Claims Act as to his comments relating to Kelley-Moser made to District Board Members, District Employees, and representatives of individual charter schools or charter school applicants.

Dr. Daniels July 17, 2009 email to Joel Medley, acting head of charter schools within the South Carolina Department of Education, also meets the threshold of being within the scope of Dr. Daniels' official duties.  This is because the subject matter related to the establishment (and failure)

---

[22] Despite the fact that Dr. Daniels' predecessor entered the Financial Services Agreements with Kelley-Moser, Kelley-Moser argues that Dr. Daniels lacked the authority to contract at this financial level (contracts at or above $15,000).  This dispute is not, however, determinative as Dr. Daniels was, at the least, responsible for working with the financial services provider and making recommendations regarding its contracts.

[23] Kelley-Moser has not directed the court to any evidence that Dr. Daniels made any of his allegedly defamatory statements to members of his staff whose duties were such that Dr. Daniels' would have exceeded the scope of his official duties by making the challenged comments to that particular employee.

[24] One of the two Agreements which Dr. Daniels' predecessor entered with Kelley-Moser covered services to be provided to charter schools within the District.  This suggests that the subject matter covered by those Agreements was within the scope of Dr. Daniels' official duties.

of charter schools, a subject matter directly related to Dr. Daniels' duties as District Superintendent and presumably within the scope of Medley's responsibilities.

Statements Dr. Daniels made to Hobbs Group in preparation for the transition period between financial service providers, likewise, met the threshold for protection under the Tort Claims Act as those statements related to a transition for which Dr. Daniels was responsible. This includes any concerns he expressed regarding potential "time bombs" in the data, whether he was referring to potential innocent errors or intentional actions.[25]

Dr. Daniels' relationship with the Association is arguably more attenuated than his relationships with the entities and individuals discussed above. This is because Dr. Daniels did not report to, have oversight over, or a contractual relationship with the Association. It is, therefore, more likely that Dr. Daniels statements to representatives of the Association could fall outside the scope of his official duties. The court, nonetheless, finds the threshold for coverage satisfied with respect to Dr. Daniels' statements to the Association because the subject matter of Dr. Daniels' comments related to the Association's recommendation of Kelley-Moser as a service provider to charter schools. This conclusion is further supported by the close linkage between the Association and the District Board given that one member of the District Board held a senior position with the

_____

[25] In his reply, Dr. Daniels suggests that his comments to the Hobbs Group were justified because Kelley-Moser was not cooperating in the transition process. The April 29, 2009 email which included the challenged "time-bomb" and other Transition Comments, however, was made only days after Kelley-Moser was advised its contract would not be renewed. This raises at least a reasonable inference that any lack of cooperation occurred after, not before, April 29, 2009.

This is not to suggest that Dr. Daniels did not have a reasonable basis for wariness on April 29, 2009, given Kelley-Moser's April 16, 2009 email advising Dr. Daniels to "fasten your chin strap cowboy." The content of the April 16, 2009 email (and attached formal complaint to the Governor) suggested, at the least, that the transition process was not likely to be harmonious and might, if Kelley-Moser could arrange it, provide Dr. Daniels with a rough ride.

Association, which gave some schools the impression that recommendations of the Association were endorsed by the District Board. *See supra* n.4 (McLaurin testimony relating to relationship between Association, Dr. Church, and Kelley-Moser).

These threshold showings shift the burden to Kelley-Moser to at least proffer some evidence that Dr. Daniels' comments to these individuals and entities fell outside the scope of his official duties. Kelley-Moser has not proffered any such evidence. The court, therefore, finds as a matter of law that Dr. Daniels acted within the scope of his official duties with respect to his communications with District Employees, District Board Members, charter school representatives and applicants, the Department of Education, the Hobbs Group, and the Association. Dr. Daniels is, therefore, entitled to immunity under the Tort Claims Act with respect to these communications absent a showing that some other exception applies (*e.g.*, actual malice). *See infra* at 25 (discussing actual malice).

**Comments beyond the Scope of Official Duties.** The possibility that Dr. Daniels went beyond the scope of his official duties increases to the extent he made statements to any person or entity other than those listed above. Kelley-Moser has presented evidence of two such communications: comments to Ziebarth, a representative of the National Alliance, and comments to Charter Choice, a entity similar to Kelley-Moser and with which Kelley-Moser was in merger negotiations. Both sets of comments had some connection to Dr. Daniels' duties with the District and might, therefore, fall within the scope of his official duties. On the other hand, the setting of the comments to Charter Choice, a dinner at Dr. Daniels' home and nature of the comments (discouraging a merger) suggest that these comments could fall outside of the scope of Dr. Daniels' "official duties." Similarly, the lack of direct connection between the District, Dr. Daniels' duties,

and the Alliance suggests Dr. Daniels' communications with that entity might also fall outside the scope of his official duties, even if within the broader scope of his employment. The current record lacks sufficient evidence to tip the scales in either direction. Thus, the court cannot determine at this stage whether Dr. Daniels' comments to Charter Choice and Ziebarth fall within the scope of the immunity provided under the Tort Claims Act.[26]

**Conclusion as to Scope of Official Duties.** In sum, the court finds as a matter of law that most but not all of Dr. Daniels' allegedly defamatory statements were made within the scope of his official duties and therefore meet the threshold for immunity under the Tort Claims Act. This includes all comments which have been identified with sufficient particularity to be considered in this action with the exception of Dr. Daniels' alleged comments to Charter Choice and Ziebarth. This does not, however, end the inquiry as to any allegedly defamatory statement as the threshold showing of immunity may be overcome if Kelley-Moser proffers evidence sufficient to raise a genuine issue of material fact with respect to one of the grounds for loss of immunity.

**Actual Malice.** In his opening memorandum, Dr. Daniels anticipates Kelley-Moser's argument for loss of immunity and argues that he did not act with actual malice because he did not "entertain[] serious doubts as to the truth" of his statements. Dkt. No. 42-1 at 23 (citing cases addressing claims for defamation by public figures). Dr. Daniels further argues that the statements were all either true or expressions of opinion with which others agreed, suggesting that both circumstances protect him from liability as a matter of law.

---

[26] The court need not decide whether these comments are subject to immunity because it concludes neither is actionable for other reasons. *See infra* Discussion § I.C.

As anticipated by Dr. Daniels, Kelley-Moser argues that Dr. Daniels lost any entitlement to statutory immunity because his statements were made with actual malice. Dkt. No. 44 at 8-9. In addressing actual malice, Kelley-Moser argues, albeit without addressing *any* specific statements, that in addition to making "numerous allegations to different people" including the Monopoly Comments and Conflict Comments, "Dr. Daniels *implied* on numerous occasions that Kelley-Moser was unethical and would act unethically and possibly illegally." Dkt. No. 44 at 11. Kelley-Moser also argues that the Conflict Comments were made despite having received a third-party opinion from the District's accountants that Kelley-Moser's dual role did not present a conflict of interest and the Monopoly Comments were made despite the fact that Kelley-Moser provided financial management services for only about 25% of the charter schools in the District. Dkt. No. 44 at 11. These arguments are, in essence, arguments that Dr. Daniels' knew that his statements were not true or harbored serious doubts as to their truthfulness. Finally, Kelley-Moser argues that a finding of actual malice is supported because some of Dr. Daniels' statements implied that Kelley-Moser "was part of a conspiracy to create charter schools with the sole intent to get paid." *Id.* at 12. This argument appears to refer to the comments made in Dr. Daniels' letter to Joel Medley of the South Carolina Department of Education (which referenced Kelley-Moser by name).[27]

Thus, in arguing that there was no malice, Dr. Daniels focuses on the constitutional actual malice standard (applicable to defamation cases brought by public figures). *See New York Times v. Sullivan,* 376 U.S. 254 (1964) (requiring proof by clear and convincing evidence that the speaker

---

[27] Kelley-Moser may also be referring to Dr. Daniels' statements to Ziebarth of the National Alliance. Those statements are not, however, relevant to the present discussion because the court has not found a sufficient basis to hold, as a matter of law, that these statements satisfy the threshold for coverage under the Tort Claims Act.

either knew the statement was false or harbored serious doubts about its truthfulness). Kelley-Moser appears to apply both the constitutional standard and a more generally applicable state common law actual malice standard. The latter is not dependent on the nature of the tort or status of the target of the alleged wrongful conduct. Instead, it considers the motivation of the alleged wrongdoer. *See Swicegood v. Lott*, 665 S.E.2d 211, 214 (S.C. App. 2008) (holding, in addressing whether abuse of process claim could be pursued under the Tort Claims Act against sheriff *in his official capacity* – which turns on the same "official duties" inquiry – that "[a]ctual malice in this situation refers to common law actual malice, and has been defined by situations where "defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff.").

The term "actual malice" is not defined under the Tort Claims Act. Instead, it draws its meaning from other sources, with the meaning varying depending on the nature of the underlying tort. *Compare Swicegood*, 665 S.E.2d at 214 (applying common law actual malice standard in addressing immunity under the Tort Claims Act where underlying claim was for abuse of process) *with Sanders v. Prince*, 403 S.E.2d 640 (S.C. 1991) (applying constitutional actual malice standard in addressing immunity under the Tort Claims Act where underlying claim was a defamation claim brought by public figures).[28]

---

[28] In *Sanders*, the South Carolina Supreme court explained the distinction between the constitutional and common law standards in a defamation action brought by two members of a county school board against a third member of that board, explaining as follows:

> [T]he trial judge's instructions on the definition of actual malice were erroneous because they included the definition of common law malice. In cases involving the defamation of a public official, the plaintiff must prove that the defendant acted with constitutional actual malice, that is, with knowledge that the statement was false or with reckless disregard of its falsity. . . . Instructions [on common law malice], which permit the jury to impose liability on the basis of the defendant's hatred, spite, ill will, or desire to injure are clearly impermissible. . . . Ill will toward the plaintiff,

For reasons explained above, the court has found that Kelley-Moser was not a public figure with respect to its allegations against Dr. Daniels. Thus, for purposes of resolving Daniels' motion for summary judgment on Kelley-Moser's claims, the court considers only whether there is evidence that Daniels' comments about Kelley-Moser satisfy the common law actual malice standard which requires that he have acted with "ill will . . . with the design to causelessly and wantonly injure" Kelley-Moser. *Swicegood*, 665 S.E.2d at 214.

As noted above, Kelley-Moser's arguments focus, in part, on the constitutional actual malice standard which is not relevant here.[29] To the extent Kelley-Moser has addressed the common law

---

or bad motives, are not elements of the [constitutional actual malice] standard.

*Id.* at 642-43 (internal citations and quotation marks omitted). *See also Gause v. Doe*, 451 S.E.2d 408 (S.C. App.1994) (applying constitutional actual malice standard in affirming finding that Tort Claims Act barred police officer's defamation action against the public entity which employed him and noting that standard required "plaintiff to prove that defendant acted with actual malice [meaning] either that defendant knew statement was false or that defendant made statement with reckless disregard for its falsity.").

[29] Even if the court were to find the constitutional actual malice standard applicable, Kelley-Moser's arguments would not support a finding by clear and convincing evidence that Dr. Daniels knew his statements were false or harbored serious doubts about them. Whether he was right or wrong in his belief that Kelley-Moser was operating under a conflict of interest, the evidence strongly supports the conclusion that Dr. Daniels genuinely believed Kelley-Moser's dual service created a conflict – even in the face of a contrary opinion from the auditor. That McLaurin was also concerned about a conflict (albeit on slightly different grounds, *see supra* n. 4) also suggests that Dr. Daniels belief, even if wrong, was not disingenuous. No evidence has been presented that Dr. Daniels' expressed beliefs were not his true beliefs.

With respect to the Monopoly Comments, Dr. Daniels explained that if he used the term "monopoly" he was really referring to his conflict concerns. Thus, he may have made a poor word choice. That is not, however, evidence that he made a statement while believing it to be false or harboring serious doubts about its truthfulness.

It is of some significance here that Dr. Daniels characterizations of Kelley-Moser's situation were in the nature of opinions (discussed *infra*). This is because it is especially difficult to prove that a speaker did not, in fact, believe (or harbored serious doubts about) the veracity of his own stated opinions.

malice standard, his arguments rely on inferences to be drawn from the nature of the statements themselves. In other words, Kelley-Moser asks the court first to draw an inference from the content of the statements that Dr. Daniels was suggesting Kelley-Moser had acted or would act illegally or unethically, and then to draw an inference of actual malice from the nature of the first inference. This goes at least one inference too far. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985) (holding that a party "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another). Indeed, Kelley-Moser's statement suggests that an inference of actual malice may be drawn from proof of the basic elements of the tort: that a false and defamatory statement was made.

Kelley-Moser's arguments face an additional hurdle, which is that they characterize the evidence in general terms without providing citation to specific evidence. *See, e.g,* Dkt. No. 44 at 10-11. What minimal citation to the record is included in Kelley-Moser's response to Dr. Daniels' motion is in its sections labeled "Slander Per Se" and "Libel," the underlying support for which is incorporated into the statement of facts above. These sections disclose the persons to whom the allegedly defamatory statements were made and characterize the content in relatively general terms. Nothing in these characterizations or the cited evidence suggests a basis for finding that Dr. Daniels made the allegedly defamatory statements for the purpose of harming Kelley-Moser, rather than for the purpose of protecting the District, even assuming an inference of unethical or illegal conduct by Kelley-Moser might be drawn from one or more of Dr. Daniels' comments.

Kelley-Moser's strongest argument in favor of finding that Dr. Daniels acted with common law actual malice (*e.g.*, ill will) is founded on claims that Dr. Daniels had meetings or conversations with representatives of two charter schools (or applicants) which those representatives later

characterized as focused on or limited to "bashing" Kelley-Moser. The "bashing" characterization might suggest that Dr. Daniels made statements to these representatives which revealed ill will towards or an intent to harm Kelley-Moser. Proving up that suggestion would, however, require proof of what Dr. Daniels' actually said to the school representatives. Such proof is not, however, forthcoming as the only evidence proffered is Moser's repetition of the school representatives' characterization of the meetings. This is simply not enough to establish what was said in the meeting, much less that the comments were made with actual malice.[30]

Because Dr. Daniels pointed to the absence of supporting evidence of actual malice in his memorandum (albeit based on the constitutional actual malice standard), it was incumbent on Kelley-Moser to direct the court to evidence which would support a finding of actual malice. Kelley-Moser's arguments and characterizations of the evidence are not enough to meet this burden. The court, therefore, finds that Kelley-Moser has failed to raise a genuine issue of material fact with regard to the issue of actual malice as to any statement otherwise subject to immunity under the Tort Claims Act. Kelley-Moser has not proffered evidence of any other basis which might void Dr. Daniels' right to immunity under the Tort Claims Act. It follows that Dr. Daniels is entitled to summary judgment on Kelley-Moser's sole claim (defamation) to the extent that claim is founded on Dr. Daniels' comments to District Employees, District Board Members, the Association, representatives of or applicants for charter schools, the Department of Education, and the Hobbs

---

[30] Dr. Daniels' Transition Comments to Hobbs, including his expression of concern regarding possible "time bombs," likewise fails to suggest ill will, particularly in light of Kelley-Moser's then-recent email forwarding Kelley-Moser's formal complaint to the Governor and commenting, *inter alia*, that Dr. Daniels should "fasten [his] chin strap."

Group. This leaves the statements made to Charter Choice and Ziebarth of the National Alliance for further consideration.

### C. Comments to Charter Choice and Ziebarth

For reasons explained above, the record does not support finding, as a matter of law, that Dr. Daniels' statements to Charter Choice and Ziebarth fall within the scope of his official duties. Thus, the ruling above does not apply to these comments. There are, however, other considerations which support entry of summary judgment in Dr. Daniels' favor to the extent Kelley-Moser's defamation claim is based on these alleged statements.

**Charter Choice.** First, as to Charter Choice, there is no evidence that a defamatory statement was made. The only evidence of any statement being made is Moser's testimony that a representative of Charter Choice advised Moser that Dr. Daniels had discouraged any merger between Charter Choice and Kelley-Moser by stating that competition was good and otherwise indicating that Charter Choice did not need to merge with Kelley-Moser to compete for the District's business.[31] Setting aside any hearsay concerns, there is nothing in this characterization of Dr. Daniels' comments which suggests he made any statements which were false or defamatory.

**Ziebarth.** Dr. Daniels' comments in his July 22, 2009 email to Ziebarth are, likewise, insufficient to support a claim for defamation. This is because there is no explicit reference to Kelley-Moser in the challenged email and no other evidence which would support a finding that Ziebarth, who was not located in South Carolina or affiliated with the District, would have understood any of Dr. Daniels' comments to refer to Kelley-Moser. *See* Dkt. No. 42-13.

---

[31] The comments were apparently made over dinner at Dr. Daniels' house.

### D.     Privilege

In addition to statutory immunity under the Tort Claims Act, Dr. Daniels argues that he is entitled to a qualified or conditional privilege for his statements.  Such a privilege applies if "(1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused.  *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126, 134 (S.C. 1999) (also nothing that first question is for the court, and second, normally, for the jury).  One source of a conditional privilege is the existence of a common interest.  "When one has an interest in the subject matter of a communication, and the person . . . to whom it is made has a corresponding interest," then the communication is privileged by reason of the common interest so long as "honestly made."  *Bell v. Bank of Abbeville*, 38 S.E.2d 641, 643 (S.C. 1946) (noting statement "must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed").  Such a privilege may be overcome by showing actual malice, meaning "the defendant was activated by ill will . . . with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference for plaintiff's rights."  *Swinton Creek*, 514 S.E.2d at 134.

Dr. Daniels argues he is entitled to qualified privilege because all of the alleged statements related exclusively to the District and the public charter schools he managed and were published only to individuals who had a right to hear the comments by virtue of their employment or roles within the charter school community.  Dkt. No. 42-1 at 26 (also arguing he had a common law privilege because he spoke on matters of importance to school children and taxpayers).  Kelley-Moser responds that the common interest privilege protects communications only "so long as they are made without malice and remain within the proper scope" of the privilege.  Dkt. No. 44 at 12.

32

It then argues that the court "should find as a matter of law that Daniels' statements were not privileged[,]" because "there is no common interest that would protect any of Dr. Daniels' communications regarding [Kelley-Moser]." *Id.* at 13; *see also id.* at 12 (conceding that whether an occasion gives rise to a privilege is a question of law for the court). Kelley-Moser further argues that if there is a sufficient common interest the question of whether the interest has been abused is for the jury.

For essentially the same reasons addressed above with respect to immunity under the Tort Claims Act, the court finds that Dr. Daniels' alleged statements to District Employees, District Board Members, representatives of schools within the District (or applicants), the Association, and the Department of Education were subject to a common interest privilege. The court further finds an absence of evidence that the privilege was abused (again, for the same reasons as addressed above with respect to actual malice). In light of the absence of evidence, there is no issue for the jury to resolve with respect to privilege *as it relates to statements to the individuals and entities listed above.*

With respect to the alleged statements to Ziebarth and Charter Choice, the court finds some evidence of a common interest, as this concept is broader than scope of official duty, but does not find the evidence so clear as to warrant finding a common interest as a matter of law on the present record. It follows that Dr. Daniels is not entitled to summary judgment on this issue with respect to those statements. However, for reasons stated above the record does not support a claim for defamation based on Dr. Daniels' statements to either Ziebarth or Charter Choice.

E.      Statement of Opinions.

33

Dr. Daniels argues that his Monopoly Comments and Conflict Comments were merely opinions, and, consequently cannot support a claim for defamation. Dkt. No. 42-1 at 27 (also noting that others agreed with his opinions). He acknowledges, nonetheless, that courts applying the "opinion" defense have considered whether the statement can be characterized as true or false, the choice of words, the context of the statement within the publication and the broader social context. Dkt. No. 42-1 at 27 (summarizing ruling in *Sunshine Sportswear & Elecs. Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C. 1989)). In response, Kelley-Moser notes that merely labeling a statement as an opinion does not protect it from serving as a basis for a defamation claim. Dkt. No. 44 at 14 (discussing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) (noting that "expressions of 'opinion' may often imply an assertion of objective fact")).

Dr. Daniels' allegedly defamatory statements, particularly the alleged Monopoly Comments and Conflict Comments, constitute statements of opinion as they require application of some standard (*i.e.* a standard for finding a monopoly or conflict) to a set of underlying facts. Thus, these statements express an opinion *and* suggest the existence of underlying facts to support that opinion.

If the facts implied were defamatory, this could give rise to liability for defamation. However, because there are different monopoly and conflict standards which might be applied, the characterizations alone do not suggest any *specific* underlying objective facts. Instead, the implied facts must be determined from the context and content of Dr. Daniels' full comments which suggest that most if not all of the individuals to whom he directed his comments would have understood that Dr. Daniels' concerns arose from Kelley-Moser's status as concurrent service provider to both the

District and its subordinate charter schools. Thus, the only "objective facts" implied to any individuals who understood the basis of Dr. Daniels' concerns were not false (or defamatory).[32]

Kelley-Moser has not directed the court to any evidence that any hearer understood Dr. Daniels' Conflict Comments and Monopoly Comments to imply some other objective fact, much less a false or defamatory fact. Under these circumstances, the court concludes that Kelley-Moser has failed to proffer any evidence that Dr. Daniels' statements, most particularly his Conflict Comments and Monopoly Comments, implied any false and defamatory fact. It follows that these statements of opinion do not give rise to a claim for defamation.

### F.    Illegality Doctrine.

The court is not persuaded by Dr. Daniels' argument that the "illegality doctrine" bars Kelley-Moser's claim. This argument focuses on the "lengthy and ugly smear campaign" which Kelley-Moser allegedly mounted against Dr. Daniels.

As Dr. Daniels explains, the illegality doctrine holds that "no person [should] be permitted to acquire a right or action from their own unlawful act and one who participates in an unlawful act cannot recover damages for the consequences of that act[.]" Dkt. No. 42-1 at 28. The court cannot see how this doctrine applies to the facts of this case, and certainly not as a matter of law, given that Kelley-Moser's alleged wrongful acts occurred subsequent to many of Dr. Daniels' alleged wrongful acts.[33]

---

[32] Kelley-Moser maintains that there was no conflict in providing service to both the District and subordinate schools. Thus, Kelley-Moser does not suggest that any inference that it was providing such service is, alone, defamatory.

[33] Kelley-Moser's alleged "smear campaign" against Dr. Daniels appears, on the present record, to have primarily been a response to statements Dr. Daniels made about Kelley-Moser. Even if Kelley-Moser's response overstepped any privilege it had to defend itself against Dr. Daniels'

### G.     Other Arguments.

Kelley-Moser includes two "responsive" arguments which purport to respond to arguments Dr. Daniels has not, in fact, advanced.  For example, Kelley-Moser argues that the doctrine of unclean hands is an equitable defense inapplicable to his legal claim.  Dkt. No. 44 at 6-7.  While Dr. Daniels did use the term "unclean hands" as a subject heading in his statement of facts, his related argument is limited to the "illegal acts" argument addressed above.

Kelley-Moser also includes a lengthy argument under the heading "Slander Per Se."  *See* Dkt. No. 44 at 2-6 (Kelley-Moser's responsive memorandum addressing issue as lead argument).  This argument is directed to a *comment* found in Dr. Daniels' statement of facts, to the effect that Kelley-Moser suffered no damages as a result of the alleged defamatory statements.  Dr. Daniels' motion does not, however, seek summary judgment based on a lack of damages.

## II.     KELLEY-MOSER'S MOTION FOR SUMMARY JUDGMENT AS TO DR. DANIELS' CLAIMS FOR DEFAMATION AND TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE.

### A.     Dr. Daniels' defamation claim

Dr. Daniels alleges that Kelley-Moser's letter and formal complaint to the Governor and others, email to a few District Board Members, and grievance to the District Board constituted defamation.  In seeking summary judgment, Kelley-Moser relies, *inter alia*, on arguments that Dr. Daniels is a public official or public figure who must, but cannot, establish constitutional actual

---

statements and actions, that would not support an inference that Kelley-Moser's defamation claim is founded on "unlawful conduct" in which Kelley-Moser participated.  At the very least, it does not support drawing such an inference as a matter of law.

malice to succeed on his defamation claim. Dr. Daniels responds that he is not a public official or public figure.[34]

For reasons explained below, the court finds that Dr. Daniels is a public official and also a limited purpose public figure who must establish constitutional actual malice by clear and convincing evidence to succeed on his defamation claim. The court further finds that Dr. Daniels has failed to proffer evidence to support this burden of proof. It follows that Kelley-Moser is entitled to summary judgment on Dr. Daniels' defamation claim.

**Public Official Status.** Unlike Kelley-Moser, Dr. Daniels was, at the relevant time, a public employee in a position of significant responsibility. Specifically, he served as the Superintendent for a statewide public school district, with overall responsibility for running the District. As Dr. Daniels concedes in his response to Kelley-Moser's motion, a public official is an individual "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Dkt. No. 45 at 22 (quoting *Goodwin v. Kennedy,* 552 S.E.2d 319, 327 (Ct. App. 2001)); *see also See Rosenblatt v. Baer*, 383 U.S. 75. 86 (1966) ("Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both

---

[34] Despite arguing that Kelley-Moser was a limited-purpose public figure throughout the period relevant to Kelley-Moser's claim (fall 2008 through July 31, 2009), because it injected itself into a public controversy, Dr. Daniels argues that he was neither a public official nor public figure even in the later part of that period (particularly April 15, 2009 through June 6, 2009) when Kelley-Moser was making negative comments about Dr. Daniels, largely in response to Dr. Daniels' earlier negative comments about Kelley-Moser. Dkt. No. 45 at 21-23.

elements we identified in *New York Times* are present and the *New York Times* malice standards apply.").

 While the South Carolina courts have not addressed whether a superintendent of a school district satisfies this standard, a number of other states' courts have held that a school superintendent does. *See, e.g., Purvis v. Ballantine*, 487 S.E.2d 14 (1997); Dkt. No. 41-1 at 17 (summarizing multiple cases so holding). South Carolina cases addressing other positions of similar authority also suggest that South Carolina courts would hold that a District Superintendent is a public official. *See Sanders v. Prince*, 403 S.E.2d 640, 643 (S.C. 1991) (requiring trial court to charge the constitutional actual malice standard in a defamation case brought by two members of a school board because that standard applied "[i]n cases involving the defamation of a public official" ); *see also Miller v. City of West Columbia,* 471 S.E.2d 683 (S.C. 1996) (treating assistant chief of police as public official in defamation action against his employer); *Gause v. Doe*, 451 S.E.2d 408 (S.C. App.1994) (treating police officer as public official in defamation action relating to performance of his duties and citing multiple similar South Carolina cases). The cases on which Dr. Daniels relies for a contrary result are distinguishable as they involved either private persons who exercised some limited public duty (private guardian *ad litem*) or a lower level school employees (assistant principal with limited disciplinary authority). *See Erickson v. Jones Street Publishers, LLC*, 629 S.E.2d 653 (S.C. 2006) (holding private guardian *ad litem* was not a public official); *Goodwin v Kennedy*, 552 S.E.2d 319 (Ct. App. 2001) (holding assistant principal responsible only for ninth-grade discipline was not a public official and noting the split in authority as to whether school principals are public officials for purposes of defamation action).

The court, therefore, finds that Dr. Daniels is a public official, at least for purposes of this action. In reaching this conclusion, the court has considered not only Dr. Daniels' job title and duties, but also that Kelley-Moser's challenged comments (1) all related to Dr. Daniels' status and actions as District Superintendent; and (2) primarily responded to comments Dr. Daniels' made in his official capacity.

**Limited-Purpose Public Figure Status.** Even if Dr. Daniels is not a public official for purposes of this action, he became a limited-purpose public figure by virtue of the multiple negative comments he made to various entities and individuals about Kelley-Moser (beginning in the fall of 2008) which gave rise to the "public controversy" which Kelley-Moser later joined by making negative comments about Dr. Daniels (beginning in April 2009) to the Governor, other public officials, and District Board Members. *See generally Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345 (1974) ("For the most part those who attain [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."). While Kelley-Moser's approach to addressing its dispute with Dr. Daniels might have been excessive, its actions were clearly directed to the preexisting controversy in which Dr. Daniels was already taking a leading role (and had arguably created).

Thus, applying the five factor test applied in both the Fourth Circuit and South Carolina courts, the court finds that, with respect to this specific controversy, Dr. Daniels,

(1) . . . had access to channels of effective communication; (2) . . . voluntarily assumed a role of special prominence in the public controversy; (3) . . . sought to influence the resolution or outcome of the controversy; (4) the controversy existed

prior to [Kelley-Moser's] publication of the defamatory statement; and (5) [Dr. Daniels] retained public-figure status at the time of the alleged defamation.

*Erickson*, 629 S.E.2d 653, 669 (2006) (adopting Fourth Circuit's five-factor test).

For the reasons set forth above, the court finds that Dr. Daniels is a public official for purposes of his defamation claim which relates to his role as District Superintendent. In the alternative, the court finds Dr. Daniels is a limited purpose public figure with respect to Kelley-Moser's alleged defamatory statements which responded to a controversy in which Daniels was, at least, an active and voluntary participant. Dr. Daniels must, therefore, prove constitutional actual malice by clear and convincing evidence to establish his defamation claim. This requires proof that Kelley-Moser's allegedly defamatory statements were either made with knowledge that they were false or while harboring serious doubts as to their truthfulness.[35]

**Constitutional Actual Malice.** Kelley-Moser's April 15, 2009 letter and formal complaint to the Governor and similar June 6, 2009 grievance to the District Board contain two categories of statement: (1) statements presented as facts, listing comments Kelley-Moser understood Dr. Daniels had made about Kelley-Moser; and (2) characterizations of Daniels' actions as breaching the public trust or gross misconduct in office (that is, expressions of opinion). Dr. Daniels argues that the latter are defamatory statements which satisfy the constitutional actual malice standard as they accuse Dr. Daniels of criminal activity, when Kelley-Moser had no factual basis for such a claim.

---

[35] The court will assume without deciding that Moser's comments in his April 16, 2009 email to Dr. Daniels, comments in his May 20, 2009 email to one or more District Board Members, and admissions of animosity in his deposition would support a finding of actual malice under the common law actual malice ("ill will") standard. That standard is, however, irrelevant given Dr. Daniels' status as a public official, limited-purpose public figure or both.

The court will assume without deciding that if Kelley-Moser had written a letter limited to the second category of statement (accusations of arguably criminal activity), it would at least raise a genuine issue of material fact for resolution by the jury. That is not, however, the case. Kelley-Moser's challenged letters, formal complaint, and grievance disclose a specific list of allegedly wrongful actions by Dr. Daniels. Kelley-Moser characterizes one set of actions, comments to a charter school applicant, as the most egregious. The accusations of breach of the public trust and gross misconduct appear later in the documents. In context, these accusations are mere opinions based on disclosed facts. Thus, they do not imply any underlying facts other than the disclosed facts, and certainly do not imply the existence of any facts worse than the incident which Kelley-Moser characterized as the most egregious (comments to a charter school applicant).[36]

In sum, there is no evidence that Kelley-Moser stated or implied any facts which it knew were false or as to which it harbored serious doubts as to veracity. The statements about which Dr. Daniels expresses the most concern, Kelley-Moser's characterizations of his actions as a breach of the public trust or gross misconduct, are opinions based on disclosed facts. Thus, they do not imply any more serious factual allegation and do not support a finding of constitutional actual malice, and certainly not under a clear and convincing evidence standard. Even if the court were to consider Kelley-Moser's characterizations (opinions) independently under the same standard (without regard to the disclosed facts), it would reach the same result as there is no evidence that Kelley-Moser subjectively believed its characterizations of Dr. Daniels' actions to be false or unreasonable.

**B.     Dr. Daniels' claim for tortious interference with prospective advantage**

---

[36]  Because the court concludes that Kelley-Moser is entitled to summary judgment based on application of the constitutional actual malice standard, it declines to reach Kelley-Moser's argument that it is entitled to summary judgment based on a qualified privilege.

41

To recover on his cause of action for intentional interference with prospective advantage, Dr. Daniels must prove: (1) that Kelley-Moser intentionally interfered with his potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing Dr. Daniels to suffer an injury. *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 395 S.E.2d 179, 180 (S.C. 1990). If Kelley-Moser acted for more than one purpose, its improper purpose must predominate in order to create liability. *Id.* Thus, there can be no finding of intentional interference with prospective advantage if there is no evidence to suggest any purpose or motive other than the proper pursuit of its own contractual rights with a third party. *United Educ. Distributors, LLC v. Educ. Testing Serv.*, 564 S.E.2d 324, 328 (Ct. App. 2002).

For purposes of this order, the court will assume without deciding that the timing, content, and scope of distribution of Kelley-Moser's letters, formal complaint, and grievance to the Governor, District Board, and others would support a finding that Kelley-Moser acted for more than one purpose, raising a jury issue as to whether an improper motive predominated. Even with this assumption Dr. Daniels' interference claim fails because he has failed to proffer evidence from which a reasonable jury could find that any member of the District Board was swayed by Kelley-Moser's comments or actions.[37]

As noted in the discussion of facts, the official reason given for the decision not to renew Dr. Daniels' contract was the District's Board's evaluation of his performance which found Dr. Daniels lacked a vision for or had no ability to imagine the future for the District. Dkt. No. 41-17 (First Daniels dep. at 104). Both of the two District Board Members who were deposed testified that the

---

[37] Given this conclusion, the court need not decide whether Dr. Daniels had a sufficient expectation of a contract renewal to support a claim for tortious intereference with prospective advantage.

42

nonrenewal was founded on concerns unrelated to Kelley-Moser's letter. For example, Seckinger, who voted for contract renewal negotiations, testified that Dr. Daniels was not renewed "[b]ecause he had a hard time running his district. He had a hard time managing his district." Dkt. No. 41-18 (First Seckinger dep at. 53). McLaurin, who voted against renewal negotiations, testified that Dr. Daniels' evaluation was conducted by a committee made up of three "neutral" District Board Members and that McLaurin was on the committee. Dkt. No. 41-19 (Second McLaurin dep. at 89-90). McLaurin testified that the evaluation committee did not consider the letters written about Dr. Daniels and, in fact, met before Kelley-Moser made his formal complaint to the Governor. Second McLaurin dep. at 94, 98. Although he conceded that a faction within the District Board had, possibly, conspired against Dr. Daniels, McLaurin testified that "neutral members [who had] no personal animosity towards Dr. Daniels . . . did not feel like his performance, purely on a performance basis, was up to standing." Second McLaurin dep. at 97-98.

In his response, Dr. Daniels relies, primarily, on the timing of Kelley-Moser's letter to the District Board and the closeness of the vote in arguing causation:

> In April 2009, as part of Plaintiff's vendetta and smear campaign against Dr. Daniels, he wrote numerous state government officials and expressly requested that they remove Dr. Daniels from his position as Superintendent. Shortly thereafter, in May 2009, Plaintiff provided false and disparaging information to Board members Church, Hatfield, and McMullen regarding Dr. Daniels' job performance. This information ultimately led Governor Sanford's office to investigate the District and Dr. Daniels' actions. In an e-mail exchange with those Board members regarding this information, Plaintiff stated that, "Short of getting a ball bat and having a one-on-one moment of prayer with Dr. Daniels, I am running out of ideas. Hell, I have involved everyone but Santa Claus!"

> On June 6, 2009, Plaintiff sent a letter to the District's Board, accusing Dr. Daniels, among other purported acts, of engaging in gross misconduct, abusing his authority, and breaching the public trust. Prior to sending this letter to the Board, Mr. Moser discussed it with Dr. Church, who encouraged Mr. Moser to send it so "that the Board would have to act on it."

Plaintiff's attacks against Dr. Daniels were successful, as the Board decided, by a narrow vote of six to five, not to renew Dr. Daniels' contract. The Board voted on June 11, 2009--only five days after Plaintiff sent his letter to the Board complaining about Dr. Daniels. Board Members Church, Hatfield, and McMullen all voted against Dr. Daniels, and a jury reasonably could conclude that they were motivated and/or influenced, at least in part, to vote against Dr. Daniels because of Plaintiff's actions and statements.

Dkt. No. 45 at 29.

It is, of course, possible that the three District Board Member recipients of Kelley-Moser's email were influenced by that email to vote against renewing Dr. Daniels' contract. The content of the email string, however, suggests that it was these three District Board Members who approached Kelley-Moser to solicit additional opposition to contract renewal. For example, Hatfield's discussion of his February meeting with representatives of the Governor's office suggests he had been seeking Dr. Daniels' removal since at least February. His disclosure of his (and the other two District Board Member's) plan for presenting their materials to the full District Board, likewise, suggests a preexisting joint plan not only to vote against contract renewal, but to actively oppose it. Even Kelley-Moser's suggestion that he should be compensated for compiling the materials he attached suggests he was responding to a request from one or more District Board Members. Given the substantial evidence that the District Board Members were already opposed to contract renewal, and the lack of contrary evidence, it would be unreasonable to infer that Kelley-Moser's email influenced the vote of any of these three individuals.

This leaves Dr. Daniels with nothing more than a temporal link between Kelley-Moser's May 20, 2009 email to three District Board Members, Kelley-Moser's June 6, 2009 letter to the full District Board, and the close vote not to renew Dr. Daniels' contract on June 11, 2009. This is not enough to raise an inference that Kelley-Moser's email, letter, or any other communication made

on its behalf influenced the District Board's vote when considered in light of Dr. Daniels' testimony as to the reasons he was given for the nonrenewal and the consistent testimony of the only District Board Members who were deposed.

The court, therefore, holds that Kelley-Moser is entitled to summary judgment on Dr. Daniels' claim for tortious interference with prospective advantage.

## CONCLUSION

For the reasons set forth above, the court GRANTS Dr. Daniels' motion for summary judgment on Kelley-Moser's defamation claim and Kelley-Moser's motion for summary judgment on Dr. Daniels' claims for defamation and tortious interference with prospective advantage. There being no other claims, the Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

 s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
February 21, 2012